## MAYNARD vs. CLEVELAND.

This case was argued at the last term, and the decision reserved. Hall, J., being disqualified, Judge Clarke, of the Pataula Circuit, presided in his stead.]

1. While continuances are in the discretion of the court, and the refusal thereof will, ordinarily, not afford ground for a new trial, unless the discretion is abused; yet where the record shows that the discretion was not freely used, but was controlled and constrained by an erroneous notion of the law, this furnishes a distinct ground of review to a court established for the correction of errors of law.

2. Where a party has been, honestly and without indiscretion on his part, misled by a witness to rely upon his testimony on a certain

material point, and has thereby been kept from summoning another witness, who would have testified to the same point, but whose testimony could not be needed if the misleading witness had fulfilled the just expectations; and where the said party has been surprised by contrary testimony in the depositions of the witness, just executed and brought in, it is an error of law to hold that his showing for a continuance on account of such surprise and to get the other evidence, though otherwise satisfactory, is to be answered and overruled by the mere fact that the misleading witness was not his witness, but his adversary's.

3. The rule that where one witness is present to prove a certain point, a continuance cannot, of right, be claimed, to get the testimony of another witness to the same point, does not apply, where the present witness is an interested party contradicted by another.

4. Where a trustee holds a note belonging to the trust estate, and receives in payment thereof, wholly or partially, a credit allowed to himself on his own individual indebtedness, the payment is not in behalf of the maker of the note, a good payment to the trust estate, although the trustee is solvent at the time of such payment.

5. Where the bill alleges that the trustee fraudulently delivered up the note to its maker, on receipt of less than was due on it, and that the maker fraudulently co-operated with the trustee therein, such allegation is sufficient to admit evidence that part of the payment made was in such a credit in favor of the trustee individually, because thereby it is shown that, in law, less was paid than was due.

6. Where a trustee had a note payable to himself as trustee, which he claimed to be due, but which was ambiguous as to the time of maturity, and the maker contended that it was not to be paid until the majority of the *cestui que trust*, and a lawsuit was threatened, and to avoid delay, litigation and expense, the trustee allowed the maker a deduction from the amount of the note, in compromise of the controversy, and so a settlement was effected:

*Held*, that whether the deduction shall stand in favor of the note-maker, or he shall be required to pay it back to the *cestui que trust*, depends on whether the contest and compromise were honestly and in good faith made by the maker of the note.

7. A trustee, holding such a note, has the legal title thereto, and has, without any order of the ordinary, sufficient authority to compromise such contested claim, to afford protection therein to the debtor, who, in entire good faith, contests and compromises the claim.

8. Whether such contest and compromise are in good faith by the debtor is a question of fact for the jury, and should be submitted to them with proper instructions.

9. All the facts and circumstances going to show the motives of the debtor in such contest and compromise are admissible.

10. Where the bill charges the trustee with fraudulently designing to get the proceeds of the note into his hands for misappropriation, and seeks to hold the maker responsible, because he knew of such fraudulent design, and fraudulently aided therein, the said maker has the right to prove all the facts and circumstances going to show that the trustee was not acting in bad faith.

11. Where such a charge is made against the trustee, and it is proposed to show that he was trying to get the fund beyond the reach of threatened garnishment by creditors of the beneficiary's father, whose executor he was, and out of whose estate the trust fund came, and that the trustee was so acting for the sole purpose of securing the fund to the *cestui que trust*, such evidence is not inadmissible in his favor, or that of the note-maker, merely because it might show a purpose fraudulent against such creditors. To negative the charge of bad faith against the *cestui que trust*, it may be shown that the trustee was zealous enough in his service in the matter discussed to even violate the rights of others.

12. Where one, introducing interrogatories, omits certain answers, which are inadmissible in his behalf, because they purport to state the contents of a written instrument, the other party cannot introduce such answers merely to discredit the witness on other points by showing that these answers are contrary to the facts proved by the writing itself.

Jackson, C. J., and Blandford, J., concurred in the judgment, but did not concur in that portion of the opinion relating to the continuance.

February 16, 1886.    (Head-notes by the court.)

Continuance.    Practice in Superior Court.    Witness. Trusts and Trustees.    Payment.    Fraud.    Evidence.    Interrogatories.    Before Judge STEWART.    Monroe Superior Court.    August Term, 1884.

Reported in the decision.

W. D. STONE; BERNER & TURNER; T. B. CABANISS; JOHN I. HALL, for plaintiff in error.

BOYNTON & HAMMOND; ALLEN & TISINGER; J. A. HUNT, for defendant

Maynard *vs.* Cleveland.

CLARKE, Judge.

At the trial, defendant moved for a continuance for the want of, and in order to obtain, the testimony of one Brantly. By him he desired and expected to prove that, in witness's presence, Wilde C. Cleveland had actually paid to him $500. Defendant had all along known that Brantly was present at the transaction, and that he lived out of the county. But, although the case had been in court several years, he had not sued out his depositions, nor engaged him to attend, nor even consulted him on the subject. As an excuse for this apparent negligence, he made the following showing: Defendant's counsel stated that, at the preceding term, he had heard that complainant expected to prove by Wilde C. Cleveland that the latter did not, in fact, pay to defendant the $500 for which defendant had given him a receipt. Thereupon, he called on said Cleveland to know what his testimony would be on that point. W. C. Cleveland replied that, to the best of his recollection, defendant's statement was correct. Defendant himself swore that said Cleveland had told him that his (defendant's) statement of the matter was correct; and also testified that said Cleveland and said Brantly were the only persons present at the transaction. Both defendant and his counsel swore that they had no intimation of any change in W. C. Cleveland's mind on that point until the evening preceding the trial, when they discovered in depositions executed that afternoon Cleveland's contrary evidence. Defendant swore that he was misled by this course of W. C. Cleveland (who was brother to complainant) into the belief that his own statement would be confirmed by that of W. C. Cleveland, and contradicted by nobody, and therefore did not deem it needful to procure Brantly's testimony. He also exhibited a postal card received from said Cleveland as follows:

"DEAR SIR—I promised Judge Hall" (who was and is defendant's counsel) "at your last court to come over to Forsyth during this term. He requested me so to do; and while I hope sincerely that

you will neither need me or sustain any loss, yet I am willing to do anything for you, and will be over Monday night or Tuesday morning, and desire to see you and Judge Hall together. I am exceedingly sorry that you are troubled in this suit as you are, and truly hope that you will come out victorious *in toto*.

February 22, 1884.          WILDE C. CLEVELAND."

The case was called Thursday, the 28th of February. Cleveland had come as promised, but had not apprised defendant or his counsel of any change in his mind, and having sudden occasion to leave the county on Wednesday afternoon, by consent, his depositions were taken at the instance of complainant. Immediately upon discovering what said Cleveland had sworn, every effort practicable was made to get Brantly there. It was ascertained that he was somewhere abroad, traveling in the interest of a Macon mercantile house, and could not be found. Defendant swore that he did not ask the continuance for delay, but in order to get Brantly's testimony. The court overruled the motion.

It was not disputed below, or here, that the testimony of Brantly was highly material. The court placed its judgment on the proposition of law, that as the misleading of the defendant was not done by complainant or his counsel, a continuance could not be allowed. This court has repeatedly held that continuances are in the discretion of the court, and that, when refused, unless there is an abuse of discretion, this court will not interfere. But where it plainly appears that the court below acted on an erroneous notion of the law, and that without that error, the showing would have been satisfactory, and that in consequence of the refusal of the continuance the party has suffered a serious disadvantage, we hold that a tribunal for the correction of errors of law has distinct ground for reviewing the decision.

That defendant suffered a serious disadvantage is clear. He and Wilde C. Cleveland were both parties to the transaction under inquiry. Their testimony conflicted on the precise point. Brantly, as appears by his affidavit in sup-

port of the motion for a new trial, would have sworn posi·
tively to seeing W. C. Cleveland actually pay over a large
roll of money to defendant, at the time and place referred
to, when said Cleveland denied that any money passed.
Who can say that this would not have turned the scales
in the hands of the jury in favor of defendant? But it is
claimed that it has been held that the absence of cumu-
lative evidence is no ground for a continuance; and that
if a party has one witness present to testify to the same
point, he cannot continue to get another. Surely, where
the only witness present to testify to the point is a party
at interest, and where the other party contradicts him, it
cannot be the iron rule of the law that he may not have
needful time and fair opportunity to bring in disinterested
testimony to settle the dispute. It cannot be the policy
of the law, which discourages an unnecessary and expen-
sive array of witnesses to one point, to encourage parties
to rely on their own contradicted statements.

In 5 *Ga.*, 80, it is held, "It would be no reply to his
want of diligence that he and his counsel did not think
the testimony would be needed in the cause until it was
on trial." That was a suit against indorsers of a bill of
exchange, who, by the well-settled common law, were en-
titled to demand and notice. The bank cashier, who made
the demand and served the notices, though residing in
Columbus, where the trial occurred, had not been sub-
pœnaed, nor even requested to attend. When the cause
was being tried, the cashier could not be found. For want
of this indispensable part of the plaintiff's case, he was
non-suited. On his motion for a new trial, we are not
surprised that the court should hold the language above
cited.

The case cited by defendant in error in 23 *Ga.*, 613,
has for a head-note, "A party is not entitled to a con-
tinuance on the ground of the absence of testimony, unless
he has taken some steps to procure that testimony." But
the showing set forth that defendant had "failed to

take the witness's depositions, because he expected the witness to be present at the trial." Here was a plain case of *laches*.

In 55 *Ga.*, 21, during the trial, defendant moved to continue because he was surprised at the testimony of plaintiff's witness, and desired to procure contradictory evidence. There was no diligence in trying to learn what the plaintiff's witness would say, no authorized reliance on his favorable testimony, no misleading: *Held*, that there was no legal surprise at the testimony of his adversary.

In *King vs. The State*, 21 *Ga.*, 221., the defendant, indicted for assault with intent to murder, claimed surprise because the prosecutor testified to his guilt, and asked a new trial in order to get the evidence of two witnesses, whom he all along knew to have been present at the difficulty, but had not summoned, because he did anticipate his need of them. He was not misled by anybody. Such surprise was manifestly entitled to no favor, and received none.

Susan Eberhart, convicted of murder, asked a new trial because a continuance had not been allowed her. Her grounds were, first, that owing to the recency of the homicide, and her arrest, and the public excitement against her, she could not safely go to trial; second, her counsel had not had sufficient time to prepare her defence. The first ground was mere matter of opinion, and obviously was better left to the discretion of the presiding judge than to a distant reviewing tribunal, who could not so well know the state of the public feeling. The latter ground showed no particular, either as to fact or law, wherein the counsel could not be prepared. This, too, was rightly left to the discretion of the court, where the counsel were well known. In that case, the Supreme Court held that, as there was no abuse of discretion apparent, a new trial would not be granted.

None of these decisions seem at all in the way of a

new trial in the case at bar. In *Wilson vs. Brandon & Shannon,* 8 *Ga.,* 136, it was ruled that "where, on the trial of a cause, a witness, from mistake, failed to prove a necessary fact, to make out the defence to an action, the witness having previously assured the defendant that he could and would do so, whereby the defendant was prevented from procuring other evidence to prove the same fact, which it would have been in his power to do; and a recovery was had in consequence of such mistake, both on the part of the witness and the defendant: *Held,* that such mistake operated as a surprise on the defendant, and that a new trial should be granted."

The case at bar is claimed to be distinguished from that last cited, because the misleading witness here was not the defendant's, on whom he had a right to rely, but the complainant's, on whom he was not authorized to rely. Can it be possible that this makes any difference? When W. C. Cleveland was summoned, or examined, as a witness at complainant's instance, did that give complainant any exclusive property in him or his evidence, so that defendant might not consult his knowledge of the facts, and rely upon his statements as to his evidence? Nothing is more common than for both sides to subpœna the same witness. His testimony may be indispensable to both. In part it may favor one, in part the other. Here Cleveland's postal shows that Judge Hall had asked him to attend in favor of defendant, and that he had promised to do so. The presumption of law is, that a witness, summoned to court by either side, comes as an impartial witness to the truth. The mere fact that one party has first summoned him may, indeed, excite the suspicion of the other party, that his adversary has ground to expect to be benefited by the testimony. Thus he may be put upon inquiry. But when he has actually inquired of the witness himself, and been told that, on a certain point, he will support the inquirer, then whether the inquiring party may rely on him or not, depends on all the considerations which ought to influence

a reasonable man    Why, in this case, should Maynard have distrusted W. C. Cleveland?    There appeared no conflict of interest between them.    They were both defendants to this bill, brought to make both liable for wrong-dealing between them.    Cleveland seemed to be his friend. Even down to the date of the postal card, strong assurance was given to his confidence.    If anything is to be inferred against the prudence of trusting him, from the fact that the complainant had first called him, that inference seems exceedingly weak when we consider that the complainant · might have called him to attest other facts in the case, and not this particular one ; and that he might have been exercising his right to put upon the stand a party to whom he was opposed, in the hope of forcing a confession.    Furthermore, it is a fact that the pleadings of complainant did not allege that the money was not paid, as Maynard claimed.    Therefore, it did not appear that W. C. Cleveland was called by complainant for the express and sole purpose of proving that denial.    We think that, when that fact was not expressly put in issue by the pleadings ; when defendant had no ground whatever to expect contradiction from any other source, because he, Cleveland and Brantly only were present ; when Cleveland, his friend, on special inquiry, told him and his counsel, separately, that defendant's statement was correct ; and when, without any intimation to the contrary, he gave the assurances contained in the postal card, Maynard could not be charged with unauthorized credulity in relying upon his support in his testimony ; nor could he be charged with negligence in not encumbering the case and increasing the labor and cost by taking Brantly's interrogatories to prove what was not denied by the pleadings, and, it seemed, was not to be denied by any witness, but rather to be attested by two.    We think that the continuance ought to have been allowed.    *Brown vs. State,* 65 *Ga.,* 332.

The complainant introduced in evidence an original receipt, of which here follows a copy, to-wit:

"'This is to state that Wilde C. Cleveland has this day paid to me, for Howell Adams, five hundred dollars, and·this is my receipt for the same.                        W. T. MAYNARD.

January 14, 1871."

W. C. Cleveland, by interrogatories above referred to, testified for complainant, that he did not actually pay or pass any money to Maynard, as stated in said receipt, but explained the receipt as follows: Howell Adams owed Maynard $500; Cleveland owed Howell Adams; Maynard owed W. C. Cleveland, as trustee for complainant, a note hereinafter described; for mutual convenience, Cleveland credited Maynard on his note, and received this receipt from Maynard. The jury was called on by a special inquiry to find whether Cleveland did actually pay this $500 to Maynard for Howell Adams; and, by another query, they were asked whether any arrangment was made between W. C. Cleveland and Maynard, by which the former got his indebtedness to Adams settled by crediting Maynard on the latter's indebtedness to the trust estate. The jury found a negative answer to the first inquiry, and found that such an arrangement as last described was made with the $500. On these findings, the court decreed in favor of complainant against Maynard for this $500 and interest. To the above evidence of Wilde C. Cleveland, defendant objected, on the ground that the bill contained no allegation "of a misappropriation of any part of the trust funds in the payment of the' debt of Cleveland to Howell Adams." The objection was overruled.

We find no specific mention in the bill, either of Howell Adams, or of the particular credit on Maynard's note. Neither does the bill charge expressly that any part of the payment which Cleveland, trustee, credited to Maynard was produced by any credit procured for said Cleveland on his own individual indebtedness. But the bill charges as follows, to-wit:   That Maynard, being indebted to Wilde Cleveland, as trustee for complainant, upon a promissory note for $2,500, the said Maynard and the said trustee "en-

tered into some pretended fraudulent contract by which said note was delivered up to said Maynard, and a sum of money, much less than was then due on the note, turned over to Wilde C. Cleveland." Again it charges, "The said Maynard made, or pretends to have made, some fraudulent arrangement, which they call a settlement, by which said Maynard obtained said note by placing a large sum of money in the hands of said Wilde C. Cleveland, the same being one thousand dollars, or other large sum, less than was due on said note." The charge is also made that the trustee was known by Maynard to be insolvent at the time of such settlement. Now, if it is true that, in making the settlement on said note, the debt which the trustee individually owed to Adams was cancelled in favor of the trustee, and that that relief to Wilde C. Cleveland individually was accepted as $500 paid on Maynard's note to him, as trustee, then, to the amount of $500, the trustee collected from Maynard " less money than was due on the note." In law such an exchange of debts, agreed on by such parties, would be a fraud on the rights of the *cestui que trust.* Such evidence, therefore, is in support of the allegations quoted. This overrules the 24th ground of the motion for a new trial.

On this branch of the case, as to the $500 said to be paid " for Howell Adams," the defendant asked the court to submit to the jury the following charge, to-wit: " Although you may believe that W. C. Cleveland did not pay any money to Maynard for Adams, but that the transaction was an exchange of debts, yet if you believe that Wilde C. Cleveland, the trustee, was perfectly solvent at the time, and had funds and property to pay his debts, and that the arrangement was made simply as a convenience to Wilde C. Cleveland, trustee, then I charge that such a transaction would be a good payment to Cleveland, trustee." This request the court overruled, and that is made the 22d ground for moving a new trial.

In *Manning vs. Manning, guardian, et al.,* 61 *Ga.,* 136, a

guardian settled with his successor by turning over to him debts which the latter individually owed to him. The successor receipted as for so much of the effects of the ward. Justice Jackson, delivering the opinion, says: "We think that such a transaction cannot stand in a court of equity; that it would admit of too much opportunity for fraud to suffer it to stand. The principle prohibiting such conduct was, in effect, ruled in 48 *Ga.*, 500.' The head-note in that case, fairly formulating the law of the case, is, "A guardian cannot discharge his trust by turning over to his successor debts due to himself individually from that successor." This plainly implies the principle that Wilde C. Cleveland could not receive, in payment of what was due to his ward, demands on himself individually. The debtor who settled with him that way is a party to the attempted misapplication of the trust funds. As in the decision just cited, we hold that such is the rule, though the trustee be solvent at the time, if, owing to his subsequent insolvency, the *cestui que trust* is injured by the settlement. The request for the charge was properly refused. Code, §3152; 55 *Ga.*, 21; 61 *Id.*, 137; 2 Spence's Eq. Jur., 374, 385; 12 Peters, 221, 230; Lewin on Trusts, 456, 458, 846, 847; 14 *Ga.*, 342.

Another question, which constitutes the issue involved in numerous grounds presented by the motion for a new trial, arises upon the following state of facts: The bill was filed against Wilde C. Cleveland, the trustee of complainant, and against Maynard. It sought to make Cleveland responsible for the amount of a note which Maynard had owed to him as trustee, and which it was charged that Cleveland had delivered up to Maynard for much less than the amount due thereon, and of which so much as Cleveland had collected he had wasted. A decree had been rendered at a preceding term, as against Cleveland, for the full amount, but the bill was now on trial against Maynard alone, seeking to make him liable for his alleged fraudulent co-operation with Cleveland, trustee, in the waste of

the said fund. The jury did not find him liable for the whole amount of his said note, but for the $500 and interest thereon, already explained in this opinion, and for the sum of $200 and interest thereon,—this last sum being the amount which they found had been deducted from the note, and from which Maynard, at his final settlement with the trustee, had been released. The note in question reads as follows :

" $2,566.00.    One day after, date I promise to pay Wilde C. Cleveland, trustee for Oliver Cromwell Cleveland, twenty-five hundred and sixty-six dollars, to be paid at my option, by paying the interest yearly.
This February 5th, 1869.    .        W. T. MAYNARD."

It appears by the testimony of Maynard and of Wilde Cleveland that, at the final settlement of the note (in March, 1871), there was a deduction from the amount of the note allowed by Cleveland to Maynard. The evidence differing as to the amount of that deduction, the jury found it to be $200. The complainant claimed that this concession was fraudulently allowed by the trustee, then insolvent, in order to induce Maynard to pay over to him at once the balance of the note, which he meant to apply to his own use, and that Maynard, knowing the insolvency and fraudulent designs of the trustee, was in fraudulent collusion, induced by the concession to pay the said balance to the trustee. Maynard claimed that the concession was allowed by the trustee upon Maynard's demand as a compromise of a controversy between them concerning the obligation of the latter to make payment at that time; that it was a fair and honest demand on his part as compensation for yielding up his right to postpone the payment, and was fairly allowed by the trustee to get rid of a difficulty in the way of immediate collection—a difficulty which, if he could otherwise overcome it at all, could be surmounted only by litigation and heavy expense. This statement brings us to the construction of the note. The court and counsel below all treated the note as ambiguous

on the point of the time of its maturity, and parol evi-
dence was admitted to explain it on that question. One
Jones testified that he was present when Maynard exe-
cuted the note in question and delivered it to Washington
Cleveland, the father of complainant; that it was given
for a balance of purchase price of land bought by May-
nard from said Washington; that he saw Maynard pay the
other part of said purchase money, being "a large sum;"
that said Washington asked Maynard to make the note
due when Oliver C. should arrive at majority; that May-
nard refused to give such a note, saying, "I will not give
a note, except it be payable one day after date, that I may
pay it at any time;" that it was then agreed to make this
note; that "both parties agreed that the word 'option'
in the note meant that Maynard could pay at any time, or
run the note until the majority of Oliver C., if he would
pay the interest annually."

Now, upon this evidence, as to the true import of the
note, Maynard claimed that his construction of the note,
in his controversy with Wilde Cleveland, was correct.
He testified as follows concerning the settlement and the
deduction allowed him: "The note was never presented
to me . . . . during the lifetime of Washington Cleveland.
After the note went into the hands of Wilde C. Cleveland,"
[the record shows Washington's death in 1869, and his
will of February 22, 1869, appointing Wilde trustee],
"James M. Simmons, in 1870, presented the note to me for
payment. I told him it was not due, but that I was ready
to pay the interest; he said he was instructed not to re-
ceive any part of the note unless he could get all. Wilde
C. Cleveland presented the note; he insisted that it was
due; I insisted it was not; he threatened to sue me. Thos.
J. Simmons presented the note and demanded payment,
insisting that it was due, and I insisted that it was not.
I offered to pay the interest, but it was refused." He states
that Wilde and he afterwards agreed on the settlement
in 1871, with the deduction, and that he paid the balance

v 76-5

of the note after the deduction and the credit of the amount which has been already explained in connection with the Howell-Adams affair. Maynard's testimony proceeds further in these words: " I did not know that Wilde C. Cleveland wanted to, or would, use the money for his own purposes; Cleveland never told me so. I did not want to pay the money at the time it was settled; I acted in good faith in the matter; I was solvent at the time." Wilde C. Cleveland testified "that he, at the time of his settlement with Maynard, held in store in his own right, unencumbered, forty bales of cotton, and was worth $6,900 above all liabilities; that his father's estate was insolvent; that himself, James M. Simmons for him, and Thos. J. Simmons, as his attorney, had all demanded payment of Maynard, who had refused it, on the ground that the note was not due, and offered to pay the interest, but was denied the right to do so; that Simmons proposed to charge him $250 to collect the note by suit; and, under these circumstances, he consented to allow Maynard the deduction for immediate payment. · He testified that he did not desire the money for his own use, and did not tell Maynard so; that Maynard never said anything . . . . to indicate that he desired to take advantage of complainant or of witness."

Maynard was, on objection, disallowed to testify that when Wilde C. demanded payment, he refused, claiming that the note was not to be paid, except at defendant's option, until complainant's majority ; that Wilde C. threatened to sue defendant in the United States Court; that to save expense of suit and for the surrender of defendant's option, the deduction was allowed and the settlement made. The exclusion of this evidence is the eleventh ground of the motion for a new trial. The twelfth ground is the refusal of the court to allow defendant to testify that, " in order to raise the money to pay off the note, he had to borrow $2,000 at 12 per cent per annum, for three months."

The tenth ground having been abandoned, is not noticed. When Wilde Cleveland was on the stand in behalf of complainant, defendant asked him "why and how the deduction was made from the amount due by Maynard in their settlement," stating that he could prove by the witness that the "witness threatened Maynard with sending the note to Texas, and suing it in the federal court;" that Maynard claimed the right to hold the money till complainant's majority, which right Wilde C. denied; that Washington Cleveland's estate was insolvent; that the Zeigler children were pressing a large claim against said estate and looking for an opportunity to serve garnishments thereon; that by advice of his attorney, to prevent this debt of Maynard from being so garnished, to save it to complainant by getting it immediately into the trustee's hands, and to avoid the expense and the exposure of a suit, he was prompted to allow Maynard the deduction. The court ruled out the question, and thence arises the sixth ground of the motion for a new trial. Defendant then offered to prove by said Wilde that the witness "acted in good faith and solely for the purpose of protecting the interest of complainant," which the court disallowed, and the seventh ground rests on that. The eighth ground is the refusal of the court to allow Wilde C. to testify to his ownership of funds of his own, which he loaned out, and used the collections made for complainant to place the latter beyond such garnishments. The ninth ground is because the court refused to let defendant prove by said Wilde C. that defendant claimed "the option to pay the note at any time he saw proper, or when complainant should arrive at age, by paying the interest on it; and that the deduction was the consideration that induced Maynard to waive his alleged option and to pay then."

As to the exclusion of the evidence described in the 8th and 7th grounds, it is to be observed that the evidence has exclusive reference to the good faith of W. C. Cleveland in allowing this deduction. It is, therefore, claimed by

defendant in error to be irrelevant to the question of the liability of Maynard. This seems to us a *non sequiter*. The bill proceeds on the notion that the trustee acted in bad faith, and that Maynard is responsible because he knew of it, colluded and co-operated in it. To make out the charge, it was legitimate to prove the bad motives of Wilde C., and then to connect Maynard therewith by proof of notice. Equally in defence, Maynard can deny, first, the misconduct of the trustee, and secondly, Maynard's notice thereof. Here let it be observed, that the verdict and decree against Wilde C. were not put in evidence in this case. But the evidence of the trustee's design to put the trust fund beyond the reach of garnishment by the creditors of Washington Cleveland is objected to, on the ground that such a design would be fraudulent as against such creditors. Those creditors, however, are not here urging the objection. Such an objection is allowed by law for their benefit. The complainant here charges the trustee with bad faith against his *cestui que trust*. If the evidence goes to show that, in his zeal to benefit the *cestui que trust*, he was even willing to violate the rights of others, it certainly tends to refute the charge of bad faith to the complainant. This remark applies to so much of the evidence, specified in the 6th ground, as refers to the occasion and the motive for the trustee to avoid such garnishment. It also applies to the record of the suit by the Zeiglers against Culverhouse, principal, and Wilde C. Cleveland, as executor, of said Washington, the rejection of which is made the 5th ground of the motion for a new trial. Such record tended to support the statement of the threatened danger of garnishment.

It is evident from the record that the court below held as the law of this case that, irrespective of the good or bad faith of either the trustee or Maynard, or both, in the matter of the deduction allowed, and regardless of whether or not it was a compromise of an honestly disputed liability

to make payment before complainant's majority, if the trustee did allow the deduction, and if Maynard, to that extent, had paid less on the note than appeared by calculation to be due, he was liable to account for it. This theory of the court shows itself in numerous applications, which will hereafter be specified. At present, let us inquire into its soundness.

It is maintained by the defendant in error that the Code (§§2538 and 2539) denies to a trustee the power to make such a compromise, except by virtue of an order of the ordinary first obtained. Section 2538 is as follows: " Administrators, guardians and others, holding trust estates, are . . authorized to compromise claims in favor of the estate they represent or their wards, where their debtors deliver *bona fide* all their property for the use of creditors, except such as is, or may be, exempt from levy and sale in cases of insolvent debtors: Provided, the ordinary, after an examination of the facts, shall first make an order directing such compromise." What does this section authorize to be compromised? " Claims in favor of the estate" or " wards " represented; *i. e.*, whatever is claimed to be due to such estate or ward, whether the claim be disputed or admitted. When is the compromise authorized by this section? When the debtor *bona fide* delivers all his property (except exemptions) for the use of creditors. This case is clearly the specific one of entering into an arrangement in the nature of a bankruptcy by which the debtor's assets are assigned for the benefit of creditors and the debtor is discharged, the trustee looking to his share in the proceeds of the assignment. The assignment may yield, more or less, on liquidation and final distribution. But if the ordinary, in advance, regards it as fair, and thinks the prospects justify it, he can authorize the trustee to enter into the arrangement and release the debtor. This order passed, and the trustee entering into the agreement accepting the assignment, the claim is com-

promised and the debtor released and the trustee safe, if the assignment ultimately produces less than one per cent on " the claim." No subsequent conditions are annexed. Of course, good faith is always demanded. For such a course of compromise, a fiduciary must get an order of the ordinary. This is not the case at bar. Section 2539 reads: " Guardians, administrators, executors, and all other persons acting in a fiduciary capacity, are authorized to compromise all doubtful debts belonging to such estates, where such settlement will advance the interest of those represented. All persons acting under the provisions of this section, on making their returns, shall make oath that the settlements thus made were in good faith, and to the best interests of the parties thus represented : Provided, the ordinary first make an order directing such compromise." Here the things to be compromised are " doubtful debts." Debts, true and real, they certainly are, but " doubtful" as to solvency. In 62 *Ga.*, 118, the court says, " This section is applicable to the one subject of doubtful debts." Where a fiduciary compromises a known and undisputed debt, on the ground that it is of doubtful solvency, if he first gets an order from the ordinary, and afterwards, in the way of a return, makes oath to his good faith therein, and that the settlement was to the best interest of the estate, the compromise is *prima facie* good, so far as the fiduciary's liability is concerned. *Ib.* But section 2537 of the Code of 1882 is in the following terms: " Administrators, executors and guardians are authorized to compromise all contested or doubtful claims for or against the estates or wards that they represent, to submit such matters to arbitration, to release a debtor if to the interest of the estate or ward, and to appoint an attorney in fact, being responsible for the acts of said attorney."

Here the subject-matter to be compromised is, firstly, " claims,"—*i. e.*, what is claimed to belong or be owing to the estate; secondly, such claims as are " contested or

doubtful." Not debts certainly due, but doubtful in solvency, but demands of doubtful validity or disputed. The two words, " contested " and " doubtful," are not precisely synonymous, so as to make the use of both an idle repetition. A claim may be " contested," which the executor sees to be beyond doubt as to its legality, and which no court would hold to be of doubtful obligation. So the executor may have just cause to doubt its validity, and an enlightened court would consider it of uncertain force, and yet no actual contests have arisen. But whether it be " contested or doubtful," this section covers it. That claims, whose justice and legality may be questioned, are the matters here referred to appears from the following clause in the section, " to submit such matters to arbitration." The claim of Wilde C. Cleveland, trustee, to collect, at once, the Maynard note was " doubtful " and "contested."

But it is observed that while §2538 mentions " administrators, guardians and others holding trust estates," and §2539 names guardians, administrators, executors and all other persons acting in a fiduciary capacity," §2537 mentions only " administrators, executors and guardians." Does it, then, include other trustees? Literally, it does not. But let us look to the reason and spirit of the law. This section is the result of §2500 in the Code of 1863, as amended by the act of 1866, p. 33. The original section mentioned only administrators. It also expressly applied only to contested claims. By the act of 1866, executors and guardians are added, and the claims are described as " contested or doubtful." These are the only substantial changes effected by the amendment. In 1866, shortly after the close of the civil war, when so much confusion and uncertainty had fallen upon the property and financial interests of the country, it was the spirit of the legislature to facilitate the settlement of controversies, and especially those in the hands of fiduciaries. This amendment was made to serve such a purpose. Sections 2538

and 2539 were enacted at the same session with this amendment, the former bearing equal date with §2537, viz., December 4, 1866, and the latter, dated December 15, 1866. Administrators, who do not hold the legal title to real estate, are herein authorized, in regard to either realty or personalty, to compromise " a contested or doubtful claim." Guardians, who hold the legal title to neither lands nor personalty in general, are so authorized. Executors, who may be without bond, and even exempted by will from making returns, are so authorized. By the action of these classes the rights of both creditors and heirs may be affected. The rights of minors are in their hands. What reason can be given for so authorizing these officers, which does not apply with like force to trustees ? Besides, the latter hold the legal title. Where the reason of the law applies, the rule ought to apply.

But if this section, for want of express mention of trustees, fails to cover them, then it can be asserted that we are without statutory law to affect the question at bar. Section 2538 applies not, because this is not a case of assignment for creditors. Section 2539 does not reach it, for, as held in 62 *Ga.*, 118, " this section is applicable," not to " contested or doubtful claims," but " to the one subject of doubtful debts." At least, then, we have no prohibition against a fair compromise by a trustee of a " contested claim." He holds the legal title to a note payable to him as trustee. In *Fountain vs. Anderson*, 33 *Ga.*, 372, it appeared that a guardian took, payable to himself as guardian, or bearer, a note for the interest of his ward in an estate. He sold and assigned the note on discount to Fountain. The guardian absconded. A successor was appointed and sued the transferee of the note for it, or its value. It was held that, notwithstanding the addition of the word guardian to the payee's name in the note, the payee held the legal title and could sell it; and that, if the purchaser bought in good faith not intending to de-

fraud the ward, he got a good title, notwithstanding he knew that the note was for the ward's benefit. The following language is used: "The legal title to promissory notes and other evidences of debt taken by a guardian, executor or administrator (for their power, duties and trust in this respect are the same), is in such guardian, administrator or executor, and he has the right to collect or sell and transfer the same, passing the legal title thereof to the transferee; and he who purchases such a note from such guardian, etc., in good faith, with no intention to commit a fraud, or knowledge that one was intended on the ward, gets an absolutely good title, . . although he may know that the note belonged to the guardian as a part of the estate of his ward; nor is he liable to account to the ward or any one else for the amount of the note so purchased or the loss accruing to the ward, or others, by such assignment." "The purchaser is not bound to inquire into the motives that induce the guardian to sell, and if he buys in good faith, with no intention to commit a fraud, or knowledge that one is intended, although the guardian, or other trustee, intends by the assignment to convert the security to his own use, in fraud," etc. That decision antedates the Code, and rests upon the common law. In the opinion, the court derives the foregoing conclusions from authorities in regard, not to guardians, but to executors. The doctrine is extended to guardians and all like trustees, "because the reasons and necessity" for the rule " are the same." In *King vs. King et al.*, 37 *Ga.*, 205, "Where a note . . . for trust property, payable to the trustee, . . was placed in the hands of an attorney . . for collection by the trustee, suit instituted and judgment obtained, which was paid in Confederate money (the currency of the country) to the attorney, received by him in satisfaction of the debt, . . . . and the . . money paid over to his client, and received by him without objection: held, that on a bill filed by the *cestui que trusts* against

the maker of the note, the attorney and the trustee, . . . the maker of the note . . . and the attorney . . . acting in good faith, will be protected." Here, because the trustee had the legal title to the note, his right or authority to receive payment that way was sufficient to protect the debtor and the attorney, unless they acted in bad faith. The liability of the trustee, however, was treated as an independent and very different question, not affecting the other defendants.   See also 69 *Ga.*, 631.

In the case at bar the note was payable to Wilde C. Cleveland, trustee.   He could have received payment in a depreciated common currency if Maynard had in good faith paid it to him, without fraudulent intention or knowledge of such, on the trustee's part.   His power to make such a compromise of a contested claim as would be legal in favor of Maynard involves the same principle.   It all depends on whether there was a *bona fide* contest raised by Maynard, and whether the deduction allowed was in good faith claimed and received by him in compromise and settlement of that dispute.   If he had, or honestly claimed to have, an option to hold on to the fund until complainant's majority, paying interest annually, such claim was of a valuable right, and its surrender might constitute a valuable consideration to Wilde Cleveland for allowing the reduction.   The question as to the good faith of Maynard ought to have been, as it was not, submitted to the jury. The evidence above quoted, tending to show the circumstances and consideration and motives of the parties to the compromise, ought to have gone to the jury.

Complaint is made in the 18th ground, that the court refused a requested charge therein recited involving this principle.   The charge, however, as worded, was faulty, in that it might be applied to the entire matter of " the settlement," instead of to the precise question about the reduction last discussed.   The 19th ground is the refusal of the court to submit to the jury a prepared question offered

by defendant for the purpose of getting the jury to pass on this last question of good faith. But the query proposed was also liable to be held to apply to the entire settlement, and for that reason the court should not have adopted it. The 20th ground is the failure of the judge to instruct the jury on the subject of the good faith of the parties We hold that that was so directly in issue, that the court could get no sufficient basis in a verdict for this reduction, except by a submission of the question of good faith in that point to the jury, with proper instructions. So we find error here. The requested charge recited in the 21st ground is a fair statement of our view of the law as above elaborated on the question of the deduction made in that compromise. It might have given the jury valuable guidance. It was error to refuse it, and to fail to charge the principle therein contained.

Several grounds of new trial are predicated upon the refusal of the court to allow the defendant to put in evidence certain parts of the depositions of James M. Simmons, sued out by complainant, and other parts of which complainant introduced. But all the evidence referred to was statements of said Simmons of the contents of the written note, contrary to the note itself in evidence. Defendant desired them admitted, not in support of the facts which they asserted, but to bear on the credibility of the witness. We know no rule for impeaching a witness that way. The ruling which we have already made as to the admissibility of the facts of the Zeigler claim against Wilde Cleveland, as executor of Washington Cleveland, and of the record of the suit in their favor, will determine that the evidence specified in the 16th and 17th grounds should have been admitted. It is the same matter in another shape.

Let the judgment below be reversed.

Jackson, Chief Justice, announced orally that he and

Blandford, Justice, concurred in the judgment rendered, but not in that portion of the reasoning of Judge Clarke relating to the question of a continuance.